This honorable court is in session again. Case number 19-7139, United States of America, ex-rail Paul A. Cimino and Paul A. Cimino Appellant v. International Business Machines Corporation, a Delaware corporation. Mr. Singh for the appellant, Ms. Mundell for the Amicus Curiae United States, Ms. Stetson for the appellee. Good morning, counsel. Mr. Singh, please proceed when you're ready. Good morning. May it please the court that Jim Lersing for the appellant, Paul Cimino. This is a False Claims Act case at the pleading stage. Our complaint alleges that IBM's fraud caused the IRS to agree to a contract it would not have otherwise accepted at a price it would not have otherwise agreed to pay. The principal question before the court is whether that allegation is plausible based on the well based on three sets of allegations. It clearly is. The first is that IBM was trying to induce the IRS to sign a contract by fraud. When IBM manufactured the false compliance penalties, its goal was to create leverage that it could use to pressure the IRS into a new contract. In order for that not to cause the IRS to enter into a contract, something would have had to go wrong with IBM's scheme. And there's nothing in the complaint that suggests anything went wrong. In fact, this brings me to the second key fact, which is that IBM got exactly the deal you would expect it to get if its fraud succeeded perfectly. Just after IBM presented its fake audit report to the IRS, the agency signed a new contract. And there's a clear relationship between the lies IBM told and the deal the IRS signed. The IRS overpaid by about 87 million, which is close to the amount that IBM falsely said was owed. And the connections don't stop there. For example, if you look at paragraph 139 of the complaint, which is on Joint Appendix 38, you'll see that IBM asserted the IRS owed penalties for 2,353 of a certain license. In the new contract, IBM billed for exactly 2,353 of that license in the first year, and then 25 for each subsequent year. IBM's misrepresentations are certainly at least one plausible explanation for those charges. You can draw a straight line between the lies they told about false compliance penalties and the deal that they ultimately got. The third set of things... Can you draw... You said there's at least a line. Can you demonstrate that there is but for causation between those two things? We certainly allege it, which is what we have to do. And when you say demonstrate, I want to be really clear. This is the pleading stage. We don't have to prove the allegations. And we've alleged it explicitly and repeatedly that the IRS would not have signed this deal, but for the fraud. That's in paragraphs... Can you point to where you have specifically alleged causation in your complaint? Sure. So the ultimate allegation of causation, you'll find it in paragraphs 31, 37, 131, and 142. Can you repeat the numbers, please? Sure. The easiest place to find this actually, Your Honor, is if you have our reply brief on page five of the reply brief, all of the relevant paragraph citations are going to be on that page. And so if you look at the top, you'll see the citations to the ultimate allegation of causation. And then if you look at those bullet points, you'll see the well-placed facts that support those allegations. What's the particular paragraph that comes closest to saying, but for? Sure. So I will take you first to paragraph 31. The materially false and inflated audit findings... And this is Joint Appendix 14. The materially false and inflated audit findings presented to the IRS and IBM's representation that it would waive those penalties if the IRS entered into a new deal caused, in substantial and material part, the IRS to enter into the license when it otherwise would not have. And that last phrase at the end there is, but for causation. And similar language appears if you go down to paragraph 131. That's about the audit findings specifically. And it says it caused the IRS to enter the license when it otherwise would not have. Paragraph 142 is about the specific promise to waive the fake penalties. And it says that caused the IRS to enter into the license when it otherwise would not have. And when you look at how closely tied the lies are to the ultimate deal, you would normally infer that it succeeded, but there is more. And this is, again, referring to the things... This is my third key set of facts, and this is the stuff in the bullets on page five of the reply brief. We have observations that support the inference of causation. So for example, IBM employee Chris Shum, who was in the room where it happened, said that the key government decision maker was concerned and scared about the audit findings. IBM's own internal accounts of the negotiations say that false compliance charges... Well, they don't call them false, but they say the compliance charges drove a large part of the deal. So they have internally booked this as something that's attributable to the penalties that they were asserting. And so you know that they played a material role and that IBM believed they played a material role and knew they played a material role. Can I understand one factual detail in the allegations? So when you say that the allegations say that Chris Shum was aware that the IRS was concerned, I think you said that the key person was concerned. And in order to bring in the key person, you're folding in paragraph... Is it five? I can't remember the exact paragraph. And so you're melding those two paragraphs together to say that paragraph 127 in talking about the IRS actually is referring not just to the IRS as an entity, but it's referring to a particular person. And that's the supervisor with whom the subsequent meeting happened. Yes, that's right. If you look at... The Shum paragraph is paragraph 127. But if you look at that paragraph in context, both in the context of paragraph five, but also its surrounding paragraphs, right? Paragraph 126, which is the paragraph right before, is talking about the meeting that happens with Jim McGrane, right? Where the audit findings are presented to him. And then paragraph 127 says Chris Shum, an employee who was present at that meeting, said that he was concerned and scared. In context, this is clearly about Jim McGrane's mindset. And of course, it must have been at the relevant time, because the thing that McGrane is asserted to be, the IRS is asserted to be scared of, is the Deloitte findings, which were presented in that meeting to McGrane. When we're talking about the IRS here, we're talking about the decision makers who are in the room, and not just the agency in some vague, undefined sense. And I think that that's really what we need to win the causation debate at the pleading stage. Again, the pleading come up with their evidence about why this didn't matter to the IRS, and we'll talk about that down the line after discovery. But in terms of evaluating the sufficiency of the allegations, it's hard to imagine allegations that are more clear, and the line for finding them plausible should be relatively low, especially when, you know, this case isn't like Twombly, where the court was looking at conduct that might be innocent, might be culpable. We really don't want to open a can of worms at discovery about something that might be innocent. IBM's conduct was highly culpable. Everything that, and even they're not contesting the sufficiency of those allegations. The things we say they did wrong, are wrong. You shouldn't do those things. And so I think allowing this case to move to discovery doesn't raise any of the concerns that were motivating the court in cases like Twombly. You're saying, are you, you jumped over your argument about a substantial factor? Is that just because the court started you with but-for causation, or can we consider that abandoned at this point? Oh, I wouldn't consider anything abandoned that was in our briefs. You know, we think we'll meet any standard of causation, and we think that if you believe we meet the district court standard, which I think we do, you don't have to reach the question of what the actual legal standard is. Mostly, I just don't want to make bad law the subject of this case, by suggesting that because we meet the higher standard, that is the standard. But if you're going to reach that question, for the reasons we've set forth in the brief, and I'm happy to talk about them, we think that the right standard is either to say that you only need materiality in a fraudulent inducement case, or substantial factor causation. No, I was not actually mentioning it because I thought there was anything to it. I understand. Just wanted to see if we could narrow and clarify matters. Can I ask you a conceptual question? So let's suppose that but-for causation is the right standard. Then if but-for causation is a necessary ingredient of a claim, what does materiality add? Because but-for causation means the decision wouldn't have been made but for the consideration at issue. Materiality says, was the consideration at issue significant? If the decision wouldn't have been made but for this consideration at issue, then how could it not be significant? I agree. If we win causation on a but-for standard, I think we win materiality. But I guess, I assumed you would agree because that helps you. But the way you presented the arguments in your brief, it seemed like what you were saying is there's a materiality requirement but there's not a causation requirement. And I almost wonder whether that seems backwards because if there is a causation requirement, then arguably there need not be, it's unclear what materiality is adding. But if there is a, if there's materiality, causation still adds something, at least but-for causation does, because but-for causation requires that it be an essential ingredient. That's correct. So let me just be clear about where this whole materiality thing came from. Materiality has been a subject of recent interest after the Supreme Court's 2016 decision in Escobar. And that was a case about implied certification. And the genesis of this was that the defendants worried that if you could bring a false claims case based on the violation of any regulation, right, or any requirement that might be relevant to payment, it would be expansive liability. And the Supreme Court said, the way we're going to sort which regulations and is we're going to look at materiality, right? So in those implied certification cases, it's only the violation of a material condition of payment that's going to get you to liability, right? And so in some cases you need that, you need to sort that out. But that's in a case where there's probably no causation, there's no causation requirement whatsoever. Right. Because in most FCA cases that are not fraudulent inducement, everyone agrees there's causation requirement. Right. But if fraudulent inducement requires, I mean, in a normal, I guess the way I look at it is in a non-fraudulent inducement case, there's a materiality requirement because the question is whether the claim is false. There's no causation that attaches to that, but it still has to be material because you wouldn't want to give effect to something that's false, but it's trivial. But in a fraudulent inducement case, the very notion of fraudulent inducement requires inducement, which means, at least I know you disagree with this, but at least arguably requires causation. And then once you have causation, query whether materiality is adding something to the causation in an inducement case. I don't think it does. I think that once you have causation, you basically have materiality plus. I read materiality to mean potential causation, maybe likely causation. But once you have actual causation, you've crossed the bridge, I think. Okay. If my colleagues don't have any further questions, then we'll- Well, I guess I do have one, if I may. Sure. But I think, is it fair to say that, Nubs, you're saying that your contention about plausibility, it comes down to, or at least entails the plausibility that the government contracting parties were intimidated by the prospect that they might be sued and agreed to a contract that they would not otherwise have agreed to, but for the threat of being litigated, that there was, I believe it was also true that they must not have looked at information that was in some column of a program and just went along with this because they were, personally, these two or three individuals were scared that the agency could be sued. I'm not completely sure that I understand the question. Our allegations certainly encompass some of those facts that you've said. What I would say is, when you ask what we have to show because of the defendant's conduct, that is, had the defendants not lied about these penalties, had not threatened to sue, had not offered to waive them if they accepted a new deal, the deal would not have been consummated as it was. What I don't want to give the impression is that we have to win all those things. If any aspect of the defendant's conduct is shown to have caused the IRS's conduct, I think the IRS to sign the deal, and that conduct is fraudulent, I think we're good. It may be, as I said, the subjective motivations, it may be that they were scared. We've got an allegation to that effect, but even if it shows that they were worried about litigation only, but they thought they might win, we think that's still enough. I just want to make sure that I'm clear about what I mean. You're portraying a government contracting process that is so sloppy or capricious that a couple of people being worried about being scared causes the government to enter into a quarter of a billion dollar arrangement. I do think that there's an argument that the IRS was not terribly sophisticated in this contracting process. If you notice, we cited in our reply brief, and this is mentioned in the complaint as well, there was an investigation. Congress had hearings about the IRS's IT contracting process specifically that found it to be vulnerable to fraud. I'm not trying to blame the government here. What I'm saying is that the government's contracting folks generally do not assume that their contractors are going to just lie to them. They tend to take statements that are made by contractors at something close to face value. That's in part because there are lots of protections, including the False Claims Act, that protect the government when the contractors do lie. While I think it's almost always the case in every government contracting fraud case that had the government been more vigilant, it might have been able to find something that would have allowed it to escape the bad deal. I don't think that that's how our society and Congress and the False Claims Act look at these issues at all. I'm not trying to insinuate that the government was bad here. What I'm trying to say is that they were lied to, and the lies are the most clear and plausible explanation for why they did what they did. And the lies were told to the frontline contracting party and his supervisor. Anyone else? Do you allege that the supervisor had the sole authority to sign off on the deal? I don't know if that allegation is in the complaint. I believe that that is a true fact, but I don't know if that allegation is specifically in the complaint. We say that Jim McGrane was the head of software acquisitions and was in charge of this deal. I don't know. I believe he may have to consult with the actual chief information officer, but I don't think that's in the complaint, and I wouldn't want to speak out of school. Thank you. Thank you. Thank you, Mr. Singh. We'll hear from the government. Good morning, Your Honor. I may please the court. My name is Amanda Mundell on behalf of the United States. This court should reverse the district court for two main reasons. First, because it erred with respect to its causation analysis, as Mr. Singh has discussed in some detail, and also because it erred in respect to its materiality analysis. And just with respect to causation, I want to make clear the government's position here is that at a bottom line, the district court's conclusion that but-for causation is required, we do agree with that. We also agree that this court doesn't need to decide that issue itself if the court concludes that the allegations of the complaint properly establish and plead but-for causation. But we do have some concerns with the path that the court took to get to that reaffirm the continuing validity of the fraudulent inducement theory as we think that it should. We would just ask that the court not introduce any ambiguity or imprecision that we find inherent in the district court's opinion. In particular, we think that the court in trying to reach the but-for causation conclusion seems as though it was reaching for something beyond what is typically required in a fraudulent inducement case. And that is to say that courts have long recognized this as an established theory of liability under the False Claims Act, and no court, not the Supreme Court in Marcus v. Hess or this court in Bettis or any other court of appeals, has really struggled to either parse out the elements of fraudulent inducement or struggled to apply them in the way that the district court did here. And when the court did announce but-for causation, it then took the extra step to say that even that level of causation, quote, understates the stringency of the FCA's causation standard. And so we have some concerns that the court was sort of looking beyond what is typically required in the fraudulent inducement context to establish but-for causation, and then resorting to various cases that are inapposite, like in the damages context, to shore up that analysis. And here, really what was required is exactly what Mr. Singh has discussed with the court in his opening argument, which is that had these fraudulent statements not been made, had the trumped-up audit findings not been presented, and the false promise to waive the $91 million penalty not been made, the government wouldn't have entered into this contract. That's pleaded explicitly in several places in the complaint, and then there are several allegations, as Mr. Singh highlighted, that make that allegation plausible. The fact that the IRS wasn't thinking about renewing this contract to begin with, that the $91 million compliance penalty was at a pain point sufficient to force the government to enter into this, quote, compliance deal, that the IRS is, of course, concerned or scared of these audit findings, and then, of course, it would not have entered into the license had it known that those representations were false. So we think for those reasons, not just did the district court misapply this inducement element to the allegations of the complaint, but really, it sort of overcomplicated, needlessly, the inquiry there. With respect to materiality, though, we think the district court erred in two main areas. First- Can I just ask you the same conceptual question? If we buy your argument that there's but for causation as a requirement, what does materiality add? Because even in your brief, when you explain why materiality is adequately pled, you just basically rely on what was explained with respect to but for causation. And I guess, conceptually, it seems like but for causation means that the consideration at issue is essential to the decision. Materiality asks, is the consideration at issue significant to the decision? And I get that there's a different temporal reference point that materiality comes ex ante and but for causation comes ex post. And suppose, maybe somebody could conjure up the hypothetical that makes use of that temporal distinction. But as a real-world matter, in the mine run of cases, does the government think that materiality adds something to but for causation in the fraudulent inducement context? No, Your Honor. And Your Honor is correct. It's very hard to imagine, if not impossible, to imagine a scenario where if but for causation is established here, that then the allegations would somehow fail on a materiality aspect. At the end of the day, if the government wouldn't have entered into the contract, absent those fraudulent statements, we know that those fraudulent statements were important or significant to the government to establish materiality. That's just a feature of fraudulent inducement as a theory of liability that isn't present in these other typical FBA false statement submission cases. Which are governed by Escobar, where the court explained the significance of materiality. Exactly right, Your Honor. And so here, the reason we've sort of split up our analysis is just because that's exactly what the district court did. It parsed out these elements as separate pieces, when really, what satisfied but for causation and complaint certainly satisfies materiality. And there's one other point that I would make with respect to that materiality point, is that when doing that assessment, in addition to failing to conduct that holistic analysis, the court did make reference to the government's declination decision in this case, not to participate. And we think this court should hold that that is simply not relevant at the materiality stage. Because there are many reasons, non-merits wise, that the government might not participate. It certainly doesn't give any information about whether the government thinks the statement is material or not. So is it not entitled even to some respect, as the district court said? Is it just simply irrelevant? That's exactly right, Your Honor. And that sort of makes sense for two reasons. One, we know that False Claims Act allows for relators like Mr. Cimino to bring these claims without the government's participation. And so it would be very odd if courts could take into account the government's declination decision as a reflection of materiality, and make it even incrementally more difficult for a relator to participate. And then secondly, of course, it simply ignores the reality of the government system, which is we simply cannot participate in every single False Claims Act case and all the other cases that we litigate in this country. And so the fact that the government doesn't participate doesn't necessarily mean that it's a comment on the merits. It could be a resource-specific problem. And it certainly doesn't mean that even if it's a merits-related decision, that it's a comment on materiality, as opposed to some other aspect of the case that's sort of difficult to discern at the pleading stage. Your Honor, unless there are other questions, we just urge that this court reverse. Thank you, Ms. Mundell. Thank you. Ms. Stetson. Good morning, Your Honors, and may it please the court. My name is Kate Stetson. I represent IBM. I'm going to start actually where Mr. Singh did, which is that this is a False Claims Act at the pleading stage. But what that means, I think, is significant, because as we know, after Twombly, Iqbal, Escobar, the pleading stage has some teeth. And there are a few basic factors that I think are relevant here. One of them draws on Judge Rao's first question, which is that it's not enough at the pleading stage to allege conclusions. You have to allege facts backing up those conclusions. And you have to allege those facts as being more than consistent with the prospect of liability. They actually have to point towards liability. In response to one of the questions Judge Ginsburg raised, this court under Iqbal is also instructed to take its common sense and experience into account when it's reviewing a motion to dismiss and the allegations in a complaint. And then, of course, there's a third thing that I don't think has come up at all yet in the argument, which is that a fraud plaintiff, including a False Claims Act plaintiff, needs to satisfy Rule 9b. So that's the additional test that these allegations need to be put through. So I want to pick up Chief Judge Srinivasan on your question about causation and materiality, because I do think as a conceptual matter, they tend to collapse into each other in a case like this. But I want to offer one view on how materiality could work as a backstop in the analysis. And that is essentially with reference to what the district court did. There are many cases at the dismissal stage, D'Agostino, Nargol, Petrados, Sanford Brown, to name four, that find that a representation to the government could not have been material when the government continued to pay on the contract. So I think while conceptually when you're talking about the point at which you're reviewing this, Chief Judge Srinivasan, you made the point about the temporal difference. That temporal difference gets erased with the passage of time. But I think where materiality, where that analysis is helpful, is in this court testing the conclusion against the facts. So what this court said in McBride is, since we have the evidence available to us, we might as well make use of it, essentially. And what we know in this case, and what the district court held, and I want to be very clear about this, this was not some kind of singular, non-holistic materiality overview. This was a multi-step commentary, which had been capped off with a reference to declination, and I want to be clear on that as well. I'll get to that in a moment. But when the district court talked about materiality, and you can find this at joint appendix 416 to 417, it made a few different observations. One was that the IRS paid all or a substantial portion of the fees, as even the complaint alleged. Most of those were paid after the case was filed. And you can cross-check that against joint appendix 320 and 336, which set out the schedule for payments. The IRS agreed to add six months to the contract. It took the contract out to its maximum time under the while the government was considering whether to bring a case. It was. And I think that's a point that Mr. Cimino makes in his briefing, is that these were just allegations rather than actual knowledge, as was the court's quote in Escobar. But I would respond that in Petrados, in Sanford Brown, in McBride, and I think in D'Agostino, all the courts had was allegations. And the Tenth Circuit in Janssen actually answered exactly this. I'm interested in a separate question, a different inference. If the IRS, pardon me, if the government, if justice receives the information suggesting there may be a case here, and it investigates that, surely it must tell the IRS, or if the IRS asks, must say, look, just keep on paying on the contract. We haven't reached a decision because we may not bring a case here. Indeed, we may conclude it's fine. We just don't know. So you have no basis for just stopping payment in the middle of the contract. Well, I don't, first of all, that's certainly not an argument that Mr. Cimino has offered here. But second, more to the point. No, it's a question about an argument that you're making, that there's somehow significance to the contract. Yes, my point is that Mr. Singh hasn't alleged that the IRS was somehow hamstrung from stepping out of the contract. Well, I'm not saying they're hamstrung either. I'm saying that it would be, it's a peculiar point for you to be making. It's not persuasive, because it would require the IRS to have stopped paying on a contract that the Justice Department had not concluded was fraudulent. Under the regulations that govern this contract, Judge Ginsburg, and you can find this at Joint Appendix 320 and the references to the regulations there, the IRS could terminate this contract for convenience. So it didn't need to wait around for the government to tell them whether there was some massive fraud that had been operated on it. And more to the point, the other- What would be more inconvenient than terminating the contract in the middle? I mean, the idea that it would be convenient for the IRS to stop paying and lose the benefit of services in the contract seems quite beside the point. I hear your point, but I don't think that's what terminating for convenience means in government contract speak. I think what it means is at the IRS's election. So it may well have been- But even if it's at the IRS's election, if they terminate, they don't get the services anymore, right? That's correct. Yes. And so from their standpoint, I think an IRS could conclude there may well be something nefarious going on here. We haven't completely figured it out yet, but it would actually be inconvenient for us to lose the services right now in the middle of tax season. Or I can't remember exactly when this occurred, but it would be inconvenient for us to stop the stream of services. Well, the IRS would have had to conclude that in 2014, 2015, 2016, and 2017. And then, of course, with the extension that it tacked onto the contract. So there is a point at which I think if we're going to engage in this hypothetical, that the IRS could have made it convenient to them simply by contracting with somebody else. And this, after all, this is not the kind of line of thought that the court thought was significant in any of the other cases that I've mentioned. Petrado's, D'Agostino in particular, those involved actual allegations of bad drugs and bad devices on the market. And I don't think that it would have been the case that an agency would have thought, I need to wait and see how this DOJ investigation shakes out before I take this bad drug off the market. The IRS had the independent authority to end this contract if it chose to, and it didn't. Is there any reason to think in the record that it was dissatisfied with the contract? No, there's no evidence in the record to think that it was dissatisfied with the contract. That's actually one of our points, is that it continued to renew the option years 2014 through 2017. I think it's irrelevant either way, frankly. I mean, the idea that they attached significance to what the IRS did or didn't do when the matter is up in the air strikes me as mistaken on both sides. Well, I take your point. I think I would say that among the other notes that the district court drew from this set of facts is that one thing we might think is that if the IRS had been overcharged by $87 million, that the IRS would have sought return of that money. And I don't think, and Mr. Singh hasn't alleged that it was somehow precluded from seeking return of that money until the DOJ finished its investigation. At this point, all we're trying to figure out is whether the allegations in the complaint are sufficient, right? I mean, I think a lot of things you're saying presumably will be brought out and might well be persuasive at the end of the day. But in terms of what's in the complaint and gets past the pleading stage, I'm curious about your reaction to paragraph 127, the one about Chris Shum. And it just says, you're talking about a particular IBM employee. So it's not a generalized allegation. It's pointing at a particular individual in a particular context, the exchange they had with the supervisor. And it specifically relates to the Deloitte findings. And it says that Shum was aware that the IRS was very concerned. And that just seems like that's a fact that goes to materiality. Very concerned seems material. It seems like a reasonable facsimile for material. And it's a specific individual who knew, who was aware that the relevant decision maker was very concerned. I think Mr. Singh is using that paragraph to support both his materiality and causation arguments. I would urge the court to look at that paragraph, not the characterization in the opening brief or the reply brief. Here is what that paragraph says. Mr. Shum was at the during the course of his employment with IBM. Mr. Shum was aware that the IRS was very concerned and scared. Now what that has morphed into by the time of the reply brief is because he was at the meeting, Mr. Shum was aware that Mr. McGrain was concerned and scared. That is a bridge too far in terms of inferring from that broad, vague statement and one paragraph of the complaint. If Mr. Shum had been at the meeting, if Mr. Shum thought that Mr. McGrain himself was concerned and scared and to Judge Ginsburg's point that Mr. McGrain even had authority to sign off on a quarter billion dollar contract in the first place, you would think that would be in the first amended complaint. Well, just to pinpoint exactly what the allegation must be dealing with, you're right to say it says during the course of his employment. And so in some sort of abstract sense, it could have been, I don't know how long Shum worked there. Let's say he worked there for 50 years. It could have been at some point in the course of his employment, but what he was concerned and scared about was the false Deloitte findings. That's what the allegation says. So it particularly relates to the very falsity that's the gravamen of the complaint, which is temporally confined, right? It's a finite point in time. It's the particular Deloitte findings, and it has to do with the very meeting. I'm not even sure that this allegation is necessary, but in terms of it's sufficient, it seems like it's pretty detailed about a particular employee having a particular concern about a particular falsity. I think it is certainly not sufficient. It's necessary to Mr. Singh's argument because this is the hook on which he hangs everything else. All of the other paragraphs that Mr. Singh mentioned in response to your question, Judge Rao, are legal conclusions. Paragraph 31, paragraph 131, paragraph 142, all of those are for X. So what he needs is the thing that shows that linking concern and simply saying that an employee was aware during the course of his employment that the IRS was scared of the audit. First of all, that's far too general, and second of all, to make the point the district court did, being concerned about the audit doesn't take that last necessary step to show that the IRS actually accepted the results of the audit, and we actually know from multiple details in the complaint that the IRS had repeatedly rejected the audit before it came to this December 19th meeting. So I think you have to blink away a lot of other signals in the complaint that Mr. McGrain, the supervisor of Mr. Kravitz, who had already rejected, excuse me, for lack of substantiation, the audit results on two separate occasions, that Mr. McGrain would have been so hornswoggled by this that he would say, I'm terribly frightened of this audit. I'm not going to ask about the assumptions that underlie this audit. I'm not going to check with Mr. Kravitz, who presumably is not somewhere who's unreasonable. I'm sorry, I cut you off. Go ahead, finish that thought, please. No, no, please, please go. Don't you have to also blink away, in pointing the other direction, what IBM was doing? Because I mean, the entire point here of IBM's scheme was predicated on the idea that the $91 million would matter. And it seems like you have to sort of blink that away, just in terms of the allegations in the complaint. I'm not suggesting what's going to be proved at the end of the day, obviously, or even whether it gets past summary judgment, of course. But just in terms of getting past the complaint, the entire object of IBM's scheme was predicated on the idea that this was going to matter. And it seems like you need to blink all that away, too, to read just the allegations in the complaint in the way that you do. But it can't be enough, Chief Judge Srinivasan, to argue that IBM thought this would matter. It may not be enough. But boy, it's, I mean, IBM is a sophisticated enterprise. I mean, based on the allegations, they went to all this work to try to make sure that the IRS was going to continue the contract because the IBM, at least one employee thought the IBM was, very concerned about it. That suggests that IBM would have had to have been pretty darn wrong about something that it understands pretty darn well. Well, I think the allegations in the complaint show that IBM was pretty darn wrong about its audit when it was rejected twice for lack of substantiation by Mr. Kravitz. So IBM's intent, you know, under the facts of the complaint, which we have to allege, or we have to accept is through at this stage. The facts that are in the complaint was that IBM was, was very determined to put one over on the IRS. What's missing from the complaint is any suggestion that the IRS, the person responsible for signing that, who, as Mr. Singh conceded, we don't even know is Mr. McGrane, that that person accepted the audit results and that that led to the signing of the contract. That is the missing big plank in the bridge that they're missing for causation purposes. And the reason that matters is because particularly in a fraud case where we are asking all fraud plaintiffs, including this relator, to plead with specificity, simply saying there was a guy who was in a meeting who worked and during the course of his employment, he got the impression that the IRS was scared of this audit. That can't possibly be enough to satisfy rule nine B. I don't think it satisfies rule eight, but when you add that additional layer of rigor, if that is the paragraph that we're talking about, then that is completely insufficient. Thank you. I'll make sure my colleagues don't have further questions for you. Thank you, Ms. Detson. Thank you. Mr. Singh, we'll give you a rebuttal time. Thanks. I'll just talk briefly about, about two points. The first is this question of continued payments and Judge Ginsburg, I think your insight that it's not relevant is exactly correct at this stage to draw any inference from continued payments when the validity of the contract has not been adjudicated would be a mistake. And especially so at the pleading stage, Ms. Detson mentioned a number of cases. One of the ones she said had only allegations, the McBride case was of course, at summary judgment. We talk about that case in depth in our brief, and there were litany effects weighing against materiality. The other cases she talks about, some of them were at the pleading stage, Petradus and D'Agostino. We've addressed those in our brief as well. And they involve some peculiar considerations relevant to the FDA, but also there was substantially more in the complaint itself about what the government knew about the allegations. And that just isn't here in this record. So again, as a matter of adjudicating the pleading stage, I think it is, you would have to pro-defense inference about materiality, which is just something you're not allowed to do. All the reasonable inferences go our way at this stage of the proceedings. The second point that I would talk about is this question about the Chris Shum allegations and just what's necessary. And Judge Srinivasan, I think you're right that you have to blink away that IBM was trying to get away with this. And you also have to blink away that really the proof is in the pudding. The deal has the fraudulent charges in it. The thing that IBM was trying to get the IRS to do, to believe, was that it owed these charges. Why would the IRS have paid an extra 87 million if it hadn't been convinced that it was required to do so? And so once you take that fact into account, there really is no plausible explanation for why this deal went down the way it did, other than fraud. But that's not the standard. I don't have to eliminate every other plausible explanation. I just have to show that we have one thing, and we have one. The fact that IBM said you owe these penalties and then the IRS wound up paying these penalties is pretty    good evidence that the IRS was convinced when previously it didn't believe it at that moment. But even if you're right, the explanation you're positing of negligence isn't a defense for IBM. You don't get to defraud the government because you think they're not going to catch you. You know, that's not how this works. Unless the IRS on its own initiative believed that these moneys without any input from IBM, you would not say that this is exculpatory. And there's no way that you could look at our complaint and say it alleges that. And so at the pleading stage, I just don't think that there's any way for that to be the kind of obvious alternative explanation, to use the Supreme Court's language from Twombly, that would eliminate liability in this case at the pleading stage. Unless the court has any other questions, I'm grateful for your time. Urge you to reverse. Thank you, counsel. Thank you to all counsel. We'll take this case under submission.
judges: Srinivasan, Rao, Ginsburg